David LeBLANC, Hedy LeBlanc, Le-Blanc Family Investments Limited Liability Company, Shreveport GP, LLC, Shreveport Doctors Hospital 2003, Ltd., and Shreveport Hospital Management, Inc., Appellants,

v.

B. John LANGE, III and Ethicus Healthcare Group, LLC, Appellees.

No. 01–08–01029–CV.

Court of Appeals of Texas, Houston (1st Dist.).

Sept. 22, 2011.

David LeBlanc, Plano, TX, Frank Gilstrap, Hill Gilstrap PC, Arlington TX, for Appellants.

John Thomas Klug, Schirrmeister Diaz–Arrastia Brem, L.L.P., Houston, TX, for Appellees.

Panel consists of Justices KEYES, SHARP, and MASSENGALE.

### OPINION

EVELYN V. KEYES, Justice.

Appellants David LeBlanc, Hedy LeBlanc, LeBlanc Family Investments Limited Liability Company, Shreveport GP, LLC, Shreveport Doctors Hospital 2004, Ltd., and Shreveport Hospital Management, Inc. (collectively, "LeBlanc") challenge the trial court's rendition of summary judgment in favor of appellees B. John Lange, III ("Lange") and Ethicus Healthcare Group, LLC ("Ethicus") in LeBlanc's suit against Lange and Ethicus for declaratory judgment, breach of fiduciary duty, legal malpractice, deceptive trade practices, negligent misrepresentation and conspiracy.[1] In five issues, LeBlanc contends that the trial court erred in concluding as a matter of law that: (1) there was no attorney-client relationship between LeBlanc and Lange; (2) there was no "spe-

cial relationship" between LeBlanc and Lange that gave rise to a fiduciary duty; (3) the settlement agreement at issue here was fair; (4) Lange did not breach a formal or informal fiduciary duty to LeBlanc; and (5) Lange was entitled to summary judgment on the issues of illegality, duress, and unconscionability.

We affirm.

### Background

This suit arises out of a personal and business association that went bad. Lange, an attorney, went into business with LeBlanc, a businessman and long-time friend, and they formed several corporate entities together. When the interests of LeBlanc diverged from those of Lange, the two fell out and this lawsuit ensued.

#### A. The Relationship Between LeBlanc and Lange

*1. Relationship Between LeBlanc and Lange Begins*

In 1987, Lange, who was a partner in the corporate section of Andrews Kurth, came to be acquainted with LeBlanc, who was employed with a healthcare company that was a client of Lange's. Lange and LeBlanc's professional association developed into a social friendship, and the two men went hunting together, golfed together, and on some occasions attended the same family events. According to Lange, the two men "engaged in business and social matters together at all times during [their] 18 year relationship."

*2. LeBlanc Founds LifeCare and LifeCare Retains Lange*

LeBlanc co-founded LifeCare Hospital ("LifeCare") in 1992. Over the next 13

---

1. LeBlanc also sued Perry Mound Trust, Renee Hepler, John Styles, and Ronald Colichia, but he does not challenge any portion of the trial court's judgment as it relates to these parties on appeal.

years, LifeCare grew from a small hospital into a company that managed other long-term acute care hospitals in twenty-two locations. During that time, LifeCare retained Lange to represent it in various corporate transactions. LeBlanc stayed with LifeCare until 2003, when he was terminated as CEO. LeBlanc contends that Lange was his personal lawyer while he was CEO of LifeCare; Lange denies it.

When LeBlanc was terminated as CEO of LifeCare in 2003, he sought Lange's aid in obtaining a lawyer for a number of disputes he had with LifeCare. Lange told LeBlanc that he could not represent him in his disputes with LifeCare, but instead introduced him to the Houston law firm of Franklin, Cardwell & Jones, P.C. ("FCJ"). LeBlanc retained FCJ in March 2003 to represent him in his suits against LifeCare in Texas, and he retained the New Orleans firm of Blue Williams, LLP to represent him in his suits against Life-Care in Louisiana. Those firms continuously represented LeBlanc in all LifeCare matters until August 2005, when LifeCare was sold. LeBlanc's lead attorney at FCJ was Greg Jones.

### 3. LeBlanc Forms the Hospital Partnership and the Management Company to Acquire and Manage the Hospital; Lange Represents LeBlanc for the Acquisition

By 2003, when LeBlanc was terminated from LifeCare, Lange had joined the firm of Jackson Walker, L.L.P. Lange had an extensive background in serving health care clients in buying and selling hospitals, surgery centers, and other health care facilities and in forming companies to develop projects. LeBlanc engaged Lange and Jackson Walker to help him acquire a healthcare facility he could manage. With the aid of Lange and Jackson Walker, LeBlanc formed a Texas limited partner-ship called Shreveport Doctors Hospital 2003, Ltd. (the "Hospital Partnership"). Lange also created Shreveport Hospital Management, Inc. (the "Management Company"), which initially served as the general partner and manager of the Hospital Partnership. Lange was the president and sole manager of the Management Company. The Hospital Partnership acquired Doctors Hospital (the "Hospital") in Shreveport, Louisiana in April 2004. Life-Care was the sole tenant of the Hospital pursuant to a 2004 lease that would be effective until June 2006. Lange and Jackson Walker charged LeBlanc more than $400,000 in attorney's fees for these services.

### 4. Lange Becomes a Full–Time Business Associate of LeBlanc

In June 2004, after the acquisition of the Hospital in April, Lange left Jackson Walker to join LeBlanc as an equal manager of the Hospital. Lange, through his family trust, Perry Mound Trust ("PMT"), and LeBlanc became minority limited partners in the Hospital Partnership. Lange and LeBlanc, through their family entities, including the LeBlanc Family Investment Limited Liability Company, were also the only shareholders, officers, and directors of the Management Company.

Lange testified by deposition that when he left his law practice at Jackson Walker in June 2004 to become LeBlanc's full-time business associate in running the Hospital he told LeBlanc that he was no longer his lawyer. LeBlanc's testimony similarly confirms that he understood Lange to be "looking for an opportunity to get out of the lawyering business" and, instead, to handle the legal side of the business while LeBlanc handled the operational side. However, LeBlanc asserts that Lange

gave him no formal notice that he would no longer represent him personally.

### 5. LeBlanc and Lange Pursue Long Term Acute Care Business and Form Ethicus

After the purchase of the Hospital, LeBlanc and Lange set out to engage in the long term acute care ("LTAC") business. They planned to create Ethicus and intended it to be an LTAC management company much like LifeCare. The plan was for Ethicus to open its first LTAC center in the Hospital after LifeCare's 2004 lease expired.

LeBlanc and Lange needed investors in Ethicus. LeBlanc still owned stock in LifeCare, the business he had helped develop. This stock, which was valuable but illiquid, would become very valuable when LifeCare was sold. Accordingly, in order to attract investors, LeBlanc agreed to secure or pay back any investments made in the Ethicus healthcare venture with the future sale proceeds of his LifeCare stock. Under these terms, John Styles and Ronald Colichia agreed to invest in the venture. As security for this guarantee, LeBlanc signed a "Collateral Pledge Agreement" pledging his LifeCare stock to Styles and Colichia. Ultimately, Lange drew up the papers and directed the creation of Ethicus. Ethicus consisted of four members: LeBlanc, Lange, Styles, and Colichia.

Lange's first task after he joined the management of the Hospital in June 2004 was to negotiate an extension of the Hospital's lease with LifeCare, its sole tenant, whose lease was about to expire. LeBlanc was excluded from these negotiations due to his substantial ownership interest in LifeCare, which created a potential conflict of interest with the Hospital.

In December 2004, on the advice of tax accountants, the Management Company was replaced by a new Texas limited liability company, Shreveport GP, LLC ("SGP"). As with the Management Company, SGP's only officers and board members (called "managers," rather than "directors") were LeBlanc and Lange. As Ethicus was intended to replace LifeCare as the lessee of the Hospital, SGP was now the entity which had authority to lease out the Hospital.

### 6. LeBlanc Sells His LifeCare Interest and Enters the Settlement Agreement

In 2005, LeBlanc was presented with the opportunity to resolve his dispute with LifeCare by the sale of the company to The Carlyle Group ("Carlyle"), which would enable him to sell his LifeCare stock. By the first quarter of 2005, LifeCare and Carlyle were in negotiations over the sale of LifeCare's stock to Carlyle. LeBlanc was represented in these negotiations by Greg Jones and others at FCJ, as well as by Guice Giambrone at Blue Williams. An agreement was reached for Carlyle to purchase LifeCare for more than $500 million in cash. As the holder of about 10% of LifeCare's equity, LeBlanc stood to earn approximately $50 million for his LifeCare stock if the sale went through.

As conditions of the sale, however, Carlyle insisted on two terms: (1) the execution of a non-competition agreement by LeBlanc that would bar him from having anything to do with any LTAC business nationwide for a period of five years; and (2) a one-year extension of LifeCare's lease at the Hospital, on the same terms as the 2004 lease.

Lange believed that both the non-competition agreement and the lease extension were harmful to the Hospital and to Ethicus, which had intended to lease the

Hospital after LifeCare's lease expired. Additionally, if LeBlanc signed the non-competition agreement, LeBlanc would be required to sever all ties with Ethicus in its plans to go into the LTAC business. The outside investors, as well as Lange, would be deprived of LeBlanc's business experience and connections in the LTAC community. Furthermore, the non-competition agreement would preclude the Hospital from leasing to any LTAC business other than LifeCare, including Ethicus, as long as LeBlanc was associated with the Hospital. Moreover, the lease-extension provision would have the effect of precluding Ethicus from opening an LTAC center in the Hospital before January 2007 at best (and not even then if LeBlanc were still affiliated with the Hospital). Ethicus would lose at least a year's profit, estimated by LeBlanc's son Chris—an Ethicus employee at the time—to be about $4 million. Thus, the sale of LifeCare, burdened with those provisions, would benefit LeBlanc in the amount of $50 million and more, while operating negatively on Ethicus and the Hospital, two entities that he and Lange co-managed. These conditions presented a conflict of interest between LeBlanc personally, on the one hand, and Ethicus and the Hospital, which he and Lange co-managed, on the other.

LeBlanc did not have the power to comply unilaterally with Carlyle's conditions. As an interested party, he could not sign the lease extension. Instead, only Lange, as the sole disinterested principal of the Hospital, could commit the Hospital to an extension of the LifeCare lease. LeBlanc had to approach Lange to fulfill Carlyle's conditions.

Lange thus became involved in the matters involving the lease extension and the non-competition agreement on behalf of the Hospital and Ethicus. He and Le-

Blanc discussed a number of options to solve the conflict of interest. Lange asked for and received a draft of the non-competition agreement and, in an email dated June 12, 2005, addressed "quick comments" to LeBlanc on the draft agreement. These comments were also sent to the officers of the Hospital and Ethicus and to a paralegal at FCJ, Renee Hepler, who was then working on LeBlanc's file and whom Lange subsequently hired for Ethicus. In the comments, Lange pointed out problems the non-competition agreement could create for the Hospital and Ethicus.

On June 27, 2005, Lange wrote to Greg Jones at FCJ, LeBlanc's lead attorney in LeBlanc's dispute with LifeCare and the sale of LeBlanc's LifeCare stock, and to Hepler, requesting the most recent draft of the non-competition agreement "to look at it from the standpoint of the Hospital Partnership and Ethicus." In it, Lange pointed out the Hospital's and Ethicus's objections to the agreement. He followed up on this email the next day with another email to Jones. In it, Lange stated that, with respect to the proposed lease extension, "David [LeBlanc] doesn't have the authority to without my consent to agree to anything on that." Therefore, he told Jones, "we do need to address my comments sent yesterday regarding [the relevant section of the lease]" and, "[a]s for the rest of the non-compete and release, that is between you guys," i.e., between LeBlanc and his attorneys at FCJ and Blue Williams.

In addition, Lange sent a two-page memo to LeBlanc, which stated,

I want to put in writing my reasons for the position I'm taking with both Doctors Hospital and Ethicus in connection with the realization of your sale of your interest in LifeCare and execution of your nationwide non-compete agreement. As a Manager of Shreveport GP,

LLC, Ethicus Healthcare Group, LLC, and Ethicus Healthcare Management, LLC, I have a duty to each of those entities and their respective businesses; accordingly my actions are intended to fully fulfill those duties.

Finally, in July 2005, at a meeting with Lange, Styles, and LeBlanc's son Chris, who was an Ethicus employee and LeBlanc's emissary, the outlines of a Settlement Agreement that could address all parties' interests with respect to the non-competition agreement and lease extension were agreed upon by the interested parties. Two days later, Lange e-mailed LeBlanc a draft of the Settlement Agreement. The Settlement Agreement provided that the Hospital would extend the lease to LifeCare, thus paving the way for the sale of LifeCare to Carlyle and LeBlanc's realization of $50 million on the sale of his stock. It also provided that LeBlanc make a $3 million payment to Ethicus to compensate it for its loss due to the extension of the lease. The $3 million compensation figure was offered by Styles based on Chris LeBlanc's estimate that Ethicus's lost profit for its first full year as licensed LTAC facility in the Hospital would be about $4 million. The agreement further provided that Syles and Colichia would release LeBlanc's LifeCare stock from its pledge to Ethicus so that the sale of the stock to Carlyle could go forward.

Over the next few days, LeBlanc reviewed numerous drafts of the agreement and had numerous telephone conversations with Lange about it. At the same time, LeBlanc was being pressured by Carlyle to resolve his differences with his business associates so that an executed non-competition agreement could be in place in advance of the closing of the LifeCare sale.

LeBlanc signed the Settlement Agreement on July 14, 2005. As required by the agreement, Lange immediately signed and forwarded to Carlyle the lease extension that he had negotiated with LifeCare, and Styles and Colichia released the pledge on LeBlanc's LifeCare stock.

Five days later, on July 19, LeBlanc signed the non-competition agreement. LeBlanc received the initial installment on the sale of his LifeCare stock, about $45 million, on August 12, 2005.

All of the foregoing facts support Lange's statements that he was not representing LeBlanc personally, that, instead, he was representing the Hospital and Ethicus or was dealing at arm's length with LeBlanc as one businessman with another, and that LeBlanc was represented with respect to all LifeCare matters by FCJ and Blue Williams.

LeBlanc produced no controverting summary judgment evidence showing that he understood Lange to be representing his interests, rather than those of the Hospital or Ethicus, with respect to the sale of his interest in LifeCare, the extension of the lease, and the execution of the non-competition agreement. Nor did LeBlanc produce any evidence that Lange, and not FCJ, was representing his interests with respect to the non-competition agreement when Lange sent emails to Jones and Hepler taking the position of the Hospital and Ethicus against LeBlanc.

To the contrary, corroborating Lange's testimony, Jones testified by affidavit that he was the lead attorney for LeBlanc in litigation in Dallas County, Texas related to LeBlanc's claim of ownership in LifeCare and that the case ultimately settled on August 8, 2005, culminating in LeBlanc's recovery and the sale of his stock for more than $50 million. Jones averred that LeBlanc was also represented in the stock sale "by several other lawyers, including Randolph Ewing of FCJ and Guice

Giambrone of the Louisiana firm of Blue Willliams, LLP." Jones' affidavit also confirmed his belief that Lange "was acting on behalf of the Hospital and Ethicus and not on behalf of Mr. LeBlanc" because "Mr. LeBlanc had interests that were separate from and adverse to the Hospital and Ethicus." Jones further averred that he recalled nothing in his dealings with Lange or LeBlanc that suggested the existence of an attorney-client relationship between Lange and LeBlanc in July 2005.

According to the Settlement Agreement, LeBlanc was supposed to wire the $3 million to Ethicus on the next business day after the closing of the stock sale, August 15. Instead, on that day, LeBlanc filed this suit to set aside the Settlement Agreement in Collin County, contrary to the exclusive venue selection provision of the Settlement Agreement.

### B. The Summary Judgments

LeBlanc alleged claims against Lange, PMT, Ethicus, Styles, Colichia, and Hepler for declaratory judgment, breach of fiduciary duty, legal malpractice, violations of the Deceptive Trade Practices Act ("DTPA"), negligent misrepresentation, and conspiracy. Ethicus counterclaimed for breach of contract and fraudulent inducement to enter the Settlement Agreement.

On August 28, 2006, Lange, PMT, and Hepler filed a summary judgment motion that sought to dismiss LeBlanc's claims for breach of fiduciary duty. On the same day, Ethicus filed a motion for summary judgment on LeBlanc's declaratory judgment claim and Ethicus's counterclaim for breach of contract. On September 11, 2006, LeBlanc filed a combined response to these motions. These motions were heard on September 18, 2006. After the hearing, both sides moved to supplement their respective summary judgment evidence.

On February 26, 2007, the trial court granted Ethicus partial summary judgment on LeBlanc's declaratory judgment claim seeking to void the Settlement Agreement, thereby dismissing LeBlanc's claims against Lange for legal malpractice, breach of fiduciary duty, breach of contract, DTPA violations, fraud, negligent misrepresentation, and conspiracy. The trial court also rendered partial summary judgment in favor of Ethicus on its counterclaim for $3 million for breach of contract, dismissing LeBlanc's affirmative defenses of duress, unconscionability, and lack of consideration. And it granted summary judgment on all of LeBlanc's original tort claims against Lange. That same day, the trial court also granted Lange's unopposed motion to supplement the summary judgment evidence, but it denied LeBlanc's motion.

On December 13, 2007, Lange moved for no-evidence and traditional summary judgment on LeBlanc's claims of breach of informal fiduciary duty based on a "special relationship." Two weeks later, Ethicus moved for no evidence summary judgment on LeBlanc's illegality claim. LeBlanc responded to both.

On May 16, 2008, the trial court granted these motions, holding as a matter of law that no "special relationship" existed between LeBlanc and Lange that created a fiduciary duty, and it dismissed LeBlanc's affirmative defense of illegality.

LeBlanc appeals from these summary judgments, which were finalized by the final judgment entered by the trial court on September 24, 2008.

### Summary Judgment Standard of Review

To prevail on a summary judgment motion, a movant has the burden of proving that it is entitled to judgment as a matter of law and that there is no genuine issue of

material fact. TEX.R. CIV. P. 166a(c); *Cathey v. Booth,* 900 S.W.2d 339, 341 (Tex. 1995). When deciding whether there is a disputed, material fact issue precluding summary judgment, evidence favorable to the non-movant will be taken as true. *Nixon v. Mr. Prop. Mgmt. Co.,* 690 S.W.2d 546, 548–49 (Tex.1985). Every reasonable inference must be indulged in favor of the non-movant and any doubts must be resolved in his favor. *Id.* at 549.

### Attorney–Client Relationship

In the first part of his first issue, Le-Blanc asserts that the trial court erred in rendering summary judgment against him because there is a genuine issue of material fact as to whether an attorney-client relationship existed between Lange and himself at the time the Settlement Agreement was executed in 2005.

■ The attorney-client relationship is contractual. *Vinson & Elkins v. Moran,* 946 S.W.2d 381, 405 (Tex.App.-Houston [14th Dist.] 1997, writ dism'd by agr.). An attorney must agree to render professional services for a client. *Id.* In order to establish the relationship, the parties must either explicitly or by their conduct manifest an intent to create it. *Id.* To make the determination of whether there was an agreement or meeting of the minds to form such a relationship, courts must use objective standards of what the parties said and did. *Tanox, Inc. v. Akin, Gump, Strauss, Hauer & Feld, LLP,* 105 S.W.3d 244, 254 (Tex.App.-Houston [14th Dist.] 2003, pet. denied). One party's subjective belief that such a relationship was formed is not sufficient. *See id.; see also Span Enters. v. Wood,* 274 S.W.3d 854, 858 (Tex. App.-Houston [1st Dist.] 2008, no pet.) ("We determine whether an [attorney-client] contract can be implied using an objective standard, . . . and we do not consider [the parties'] unstated, subjective be-

lief"). Under Texas law, an attorney-client relationship terminates upon completion of the purpose of the employment, absent an agreement to the contrary. *Stephenson v. LeBoeuf,* 16 S.W.3d 829, 836 (Tex.App.-Houston [14th Dist.] 2000, pet. denied). LeBlanc has produced no evidence of any tangible agreement to the contrary.

■ Both parties agree that Lange represented LeBlanc in the acquisition of the Hospital in 2003. The parties disagree, however, about the scope and duration of that representation.

Lange claims that, prior to and after the engagement for the acquisition of the Hospital, he never represented LeBlanc personally. He testified that he told LeBlanc that he could not represent him in his disputes with LifeCare, but instead introduced him to the Houston law firm of FCJ.

The uncontroverted summary judgment evidence shows that LeBlanc did retain FCJ in March 2003 to represent him in his suits against LifeCare in Texas, that he retained the New Orleans firm of Blue Williams to represent him in his suits against LifeCare in Louisiana, and that he was represented by these attorneys in all matters related to LifeCare, continuing through the sale of LeBlanc's LifeCare stock to Carlyle in August 2005. The summary judgment evidence also confirms that Lange left his law practice at Jackson Walker in June 2004, and joined LeBlanc in managing the Hospital. Lange testified that, at that time, he told LeBlanc that he would no longer be serving as his attorney.

There is also summary judgment evidence that Lange subsequently represented the interests of Ethicus and the Hospital against LeBlanc when the conflict between LeBlanc and those entities arose over the non-competition agreement and lease extension sought by Carlyle in connection with its purchase of LifeCare and

that Lange made his representation of these entities and his duties to those entities known to LeBlanc. Lange's testimony, the email exchanges over the non-competition agreement and lease extension in the summer of 2005, and the memo Lange sent to LeBlanc at that time all attest that Lange represented the interests of the Hospital and Ethicus in that dispute, as opposed to those of LeBlanc, due to the conflict of interest between LeBlanc and those entities and that he made his representation of those entities clear to LeBlanc.

LeBlanc did not present evidence contradicting Lange's claim that Lange told him that Lange would no longer be serving as his attorney in 2004, nor did he rebut Lange's other summary judgment evidence. Moreover, LeBlanc does not contend that there were any fee agreements, written contracts, bills, or any other tangible, written evidence of an attorney-client relationship between Lange and LeBlanc after the conclusion of Lange's representation of LeBlanc during the acquisition of the Hospital while at Jackson Walker. He does, however, point to the lack of formal notification from Lange at that time.[2]

As rebuttal, LeBlanc primarily relies upon his own testimony that Lange had been his personal lawyer since 1987 and continued to be so through the signing of the Settlement Agreement. LeBlanc's affidavit states that he believed that Lange "would act in [his] best interest." LeBlanc also points to his own deposition testimony that "Lange was my attorney before, he's been my attorney all along and he was the attorney—my attorney all the way up to the end," as evidence of an attorney-client relationship between Lange and himself at the time the Settlement Agreement was executed.

Texas law is clear, however, that a party's subjective belief is not evidence of an attorney-client relationship. *Wood*, 274 S.W.3d at 858; *Tanox, Inc.*, 105 S.W.3d at 254. Likewise, conclusory statements are no evidence of the matter they seek to prove. *See Dolcefino v. Randolph*, 19 S.W.3d 906, 918 (Tex.App.-Houston [14th Dist.] 2000, pet. denied) (citing *Lewelling v. Lewelling*, 796 S.W.2d 164, 167 (Tex. 1990)). Moreover, Texas Rule of Civil Procedure 166a(c) provides that testimony of an interested witness may be summary judgment evidence, but only if it "could have been readily controverted." *See* TEX.R. CIV. P. 166a(c). LeBlanc's subjective belief cannot be readily controverted; and, thus, his statements concerning his belief in Lange's alleged continuing role as his attorney do not meet the standard for competent summary judgment evidence.

LeBlanc's affidavit also states that he asked Lange to review and counsel him on the non-competition agreement he was required to sign in conjunction with the sale of his LifeCare stock. The affidavit does not, however, state whether Lange *agreed* to "counsel" LeBlanc as his attorney, nor does it state what "counsel," if any, Lange gave. Nor is there any summary judgment evidence that Lange counseled LeBlanc as his attorney with respect to the

2. LeBlanc points to a legal opinion that Lange gave to the Hospital's acquisition lender in December 2004 as evidence that Lange continued to represent him personally. The opinion arose out of the substitution of an LLC for the original corporate general partner of the Hospital Partnership, which required the consent of the Hospital's acquisition lender and was given by Lange as general counsel to the hospital Management Company and cited Lange's role in the acquisition while at Jackson Walker. It is no evidence that Lange represented LeBlanc personally in connection with any matter other than the acquisition of the Hospital or he continued to represent LeBlanc after leaving Jackson Walker.

non-competition agreement. Rather, the evidence is to the contrary.

LeBlanc, however, goes on to point out various legal actions that Lange undertook after June 2004. These are: (1) the creation of Ethicus and the attendant legal work; (2) the creation of the documents evidencing LeBlanc's obligations to Ethicus's members; (3) counsel Lange gave LeBlanc on how Ethicus should be structured from a management standpoint; and (4) counsel Lange gave LeBlanc on the content of the governing documents for the Management Company. Each of these actions may have involved legal work on the part of Lange. LeBlanc, however, provides no summary judgment evidence that Lange performed these actions for LeBlanc as his personal attorney. Indeed, the facts of the case establish the contrary. LeBlanc and Lange were both principals in the business entities concerning which Lange allegedly counseled LeBlanc. Lange had also operated as general counsel for the Hospital. In both capacities, Lange owed fiduciary duties to the entities, not to his business associate, as he pointed out in his memo to LeBlanc. *See Redmon v. Griffith,* 202 S.W.3d 225, 233 (Tex.App.-Tyler 2006, pet. denied) (holding that corporate officers owe fiduciary duties to corporations, not individual shareholders). Any legal activities that Lange performed concerning his and LeBlanc's mutual enterprises are logically explained as having been performed on behalf of these enterprises to which he owed unquestionable duties, as opposed to being performed on behalf of his business associate. LeBlanc has produced no summary judgment evidence to the contrary.

LeBlanc also relies on the e-mail Lange sent to him and other interested persons on June 12, 2005, including Hepler at FCJ, LeBlanc's law firm for LifeCare matters, forwarding Lange's comments on the non-competition agreement. Far from reflecting that Lange was giving LeBlanc counsel as to LeBlanc's own personal interests in signing the non-competition agreement, the comments reflect that Lange's perspective was taken in the interest of fulfilling his duties to the business entities—the Hospital and Ethicus. Lange objected to the referenced portions of the non-competition agreement as they threatened to impinge on these entities. He pointed out the problems with signing the agreement as drafted because it would compromise the rights of the business entities. He further noted that LeBlanc could not sign the agreement as written because it would require him to answer for the Hospital, which LeBlanc "can't commit for." These actions do not provide any evidence that Lange gave advice for LeBlanc's benefit or personal interest. Rather, the evidence establishes that Lange's concern was for the business entities.

The only remaining comments in Lange's email to LeBlanc on the non-competition agreement that do not specifically refer to the interests of the business entities are: (1) Lange's comment in the e-mail that "[u]nless you absolutely have to, I wouldn't raise any red flags until you are required to actually sign something," and (2) Lange's comment that the requirement that LeBlanc give LifeCare notice of virtually any business with which he had any connection was "ridiculous" and "bizarre." Such casual, incidental comments, contained as they are in a document which clearly reveals that Lange was representing the interests of the business entities, and not LeBlanc's personal interests, do not raise a genuine issue of material fact that would preclude the rendition of summary judgment.

Finally, LeBlanc cites to the June 27 e-mail from Lange to LeBlanc's counsel, Jones, at FCJ as evidence of the existence

of an attorney-client relationship between Lange and LeBlanc at the time of the signing of the Settlement Agreement. A review of this e-mail, however, reveals once again that Lange's interests, far from being aligned with those of LeBlanc as his client, were instead adverse:

> From my standpoint, I am not going to agree to the 1 year extension of the lease if Section 7 stays in place, because (i) right now it applies to Ethicus in the Shreveport market and would extend that application for an extra year (which I am not able to tolerate), and (ii) it hampers our ability to sell the hospital after the Lifecare closing (and thus impairs its value).

This first sentence negates any possible construction of the e-mail as one from an attorney to his client. Instead, the e-mail is consistent with Lange's position as a principal in the business entities who was putting the business entities' interests above that of LeBlanc.

We conclude that LeBlanc's summary judgment evidence fails to raise a genuine issue of fact concerning the existence of an attorney-client relationship between Lange and LeBlanc at the time the Settlement Agreement was executed. Therefore, the trial court did not err in holding that no attorney-client relationship existed between Lange and LeBlanc at the time the Settlement Agreement was entered and the sale of LeBlanc's LifeCare stock took place.

### Denial of Leave to Supplement Summary Judgment Record

In the second part of his first issue, LeBlanc contends that the trial court erred by denying him leave to supplement the summary judgment record. We disagree.

After the motions and responses had been filed and after the summary judgments had been argued at an oral hearing, LeBlanc sought to introduce more summary judgment evidence in his favor. The trial court denied his motion.

The rule governing summary judgments in Texas is clear: "Except on leave of court, the adverse party, not later than seven days prior to the day of the hearing may file and serve opposing affidavits or other written response [to a summary judgment motion]." TEX.R. CIV. P. 166a(c). Thus, a party seeking to late-file a response to a motion for summary judgment must seek leave of court. This leave should be granted when a litigant establishes good cause for failing to timely respond by showing that (1) the failure to respond was not intentional or the result of conscious indifference, but the result of accident or mistake, and (2) allowing the late response will occasion no undue delay or otherwise injure the party seeking summary judgment. *Carpenter v. Cimarron Hydrocarbons Corp.*, 98 S.W.3d 682, 688 (Tex.2002). A trial court's ruling on a motion for leave to file a late summary judgment response is reviewed for an abuse of discretion. *See id.* at 686. A trial court abuses its discretion when it acts without reference to any guiding rules or principles. *Downer v. Aquamarine Operators, Inc.*, 701 S.W.2d 238, 241–42 (Tex. 1985).

In this case, LeBlanc failed entirely to present a reason for the late-filing of the evidence. He did not claim accident or mistake. Instead, he merely offered the evidence "in the interest of fairness and justice." Thus LeBlanc failed to show good cause for the late-filed evidence, and the trial court did not abuse its discretion when it denied the motion. *Carpenter*, 98 S.W.3d at 686, 688.

We hold that the trial court did not err in denying LeBlanc leave to supplement the summary judgment record.

We overrule LeBlanc's first issue.

### "Special Relationship" Creating Fiduciary Duty

In his second issue, LeBlanc contends that the trial court erred in rendering summary judgment that, as a matter of law, there was no "special relationship" between himself and Lange that would give rise to an informal fiduciary duty on Lange's part. We disagree.

It is well settled in Texas that not every relationship involving a high degree of trust and confidence rises to the stature of a fiduciary relationship. *Meyer v. Cathey*, 167 S.W.3d 327, 330 (Tex.2005). Texas courts have recognized an informal fiduciary duty that arises from "a moral, social, domestic or purely personal relationship of trust and confidence." *Associated Indem. Corp. v. CAT Contracting, Inc.*, 964 S.W.2d 276, 287 (Tex.1998). However, courts "do not create such a relationship lightly." *Schlumberger Tech. Corp. v. Swanson*, 959 S.W.2d 171, 177 (Tex.1997). To impose such an informal fiduciary duty in a business transaction, the special relationship must exist prior to and apart from the agreement made the basis of the suit. *Associated Indem. Corp.*, 964 S.W.2d at 288. When all the underlying facts are undisputed, determination of the existence of a fiduciary duty is a question of law for the court. *See Nat'l Med. Enters., Inc. v. Godbey*, 924 S.W.2d 123, 147 (Tex.1996).

The facts upon which LeBlanc depends to impose a fiduciary relationship upon Lange are all found in his affidavit, are uncontested, and are as follows:

- Long-term business and personal relationship since 1987;
- Unspecified hunting trips in Mexico and Texas in which they sometimes roomed together and once took their sons;
- Lange's attendance at various golf outings with LeBlanc and his family;
- LeBlanc's attendance at Lange's father's funeral;
- Frequent family dinners together;
- Lange's attendance at LeBlanc's son's engagement party and his wedding;
- LeBlanc's assertions that he "considered Lange my lawyer, friend and business partner" and his belief "that Lange would act in my best interest."

These undisputed facts, however, do not give rise to a "special relationship" that creates a fiduciary duty.

The Texas Supreme Court faced a similar situation in *Meyer*. In that case, Cathey sued Meyer for fraud and breach of fiduciary duty arising out of their four-year collaboration on eight real estate development projects, two of which were at issue on appeal. It was undisputed that Meyer, the party as to whom a "special relationship" was asserted, was always in charge of all aspects of the projects and made the final decisions. *Meyer*, 167 S.W.3d at 330. Furthermore, Meyer controlled the financing and the books, and the court of appeals found that "Cathey relied on and trusted Meyer to treat him fairly and keep accurate financial records." *Id.* Moreover, Cathey considered Meyer a friend. He testified that they ate lunch together every day for four years. *Id.* The court of appeals reversed a take-nothing judgment in favor of Meyer on breach of informal fiduciary duty. *Id.* The supreme court unanimously reversed on the same issue, stating, "We disagree that these facts establish a fiduciary relationship." *Id.* The supreme court was unmoved by

the fact that Meyer and Cathey had worked on prior projects together. It held that "[t]hese earlier projects were arms-length transactions entered into for the parties' mutual benefit, and thus did not establish a basis for finding a fiduciary relationship." *Id.* at 331.

In the same way, LeBlanc's and Lange's dealings with respect to the Settlement Agreement were arm's-length transactions entered into for the parties' mutual benefit as principals of the Hospital and Ethicus. Not only were LeBlanc and Lange dealing with each other as sophisticated business-men, but Lange had made clear to Le-Blanc that Lange had a duty to represent the interests of the Hospital and Ethicus due to LeBlanc's conflict of interest with those entities, and LeBlanc was represent-ed throughout these dealings by FCJ and Blue Williams. Such dealings provide no basis for finding a fiduciary relationship between Lange and LeBlanc.

Furthermore, the fact that LeBlanc and Lange had been friends for years does not justify imposing a fiduciary duty on Lange. "Neither is the fact that the relationship has been a cordial one, of long duration, evidence of a confidential relationship." *Crim Truck & Tractor Co. v. Navistar Int'l Transp. Corp.,* 823 S.W.2d 591, 595 (Tex.1992), *superseded by statute on other grounds, Subaru of Am., Inc. v. David McDavid Nissan, Inc.,* 84 S.W.3d 212, 225–26 (Tex.2002).

■■■ Moreover, LeBlanc's subjective trust in Lange is not determinative of a "special relationship." As the supreme court has held, "mere subjective trust does not ... transform arm's-length dealing into a fiduciary relationship." *Ins. Co. of N. Am. v. Morris,* 981 S.W.2d 667, 674 (Tex.1998) (quoting *Swanson,* 959 S.W.2d at 177).

The Fourteenth Court of Appeals reached the same conclusion in *Dodson v.*

*Kung,* 717 S.W.2d 385 (Tex.App.-Houston [14th Dist.] 1986, writ ref'd n.r.e.). In *Dodson,* Dodson met Kung when Dodson was a "skeet boy" at Lakeside Country Club, and they developed a personal rela-tionship, which each described as "both father/son" and "mentor/protege." *Id.* at 387. Some years later, Dodson went to work for a company started by Kung, and when promises made by Kung were not fulfilled, Dodson sued, claiming a breach of an informal fiduciary duty. *Id.* The trial court rendered summary judgment against Dodson on that issue and the Fourteenth Court agreed. *Id.* The court acknowl-edged that the relationship was one of business and friendship. *Id.* at 389. Fur-thermore, it acknowledged that Kung "was in a superior position because of his wealth and business experience...." *Id.* However-er, the court observed that Dodson was not a "naive young man" when he went to work for the company: "He was 36 years old, had operated his own business at a profit and was familiar with contracts and litigation." *Id.* Most importantly, there was "no evidence that these men were not dealing at arms length and on equal terms." *Id.* Accordingly, the court held that there was no fact issue raised as to breach of a fiduciary duty. *Id.*

Here, LeBlanc co-founded LifeCare in 1992 and remained its CEO for more than a decade. The summary judgment evi-dence establishes that Lange and LeBlanc were equal partners, and there is no evi-dence that Lange held any superior posi-tion with regard to sophistication or busi-ness acumen. As succinctly stated by the Fourteenth Court of Appeals, "There is no evidence that these men were not dealing at arms length and on equal terms. There is, therefore, no fact issue raised as to ... breach of fiduciary duty." *Id.* Likewise, in this case, there is no evidence that these two men—both experienced in buying and

selling hospitals and other health care facilities, in forming companies, and in managing health care facilities—were dealing on anything but equal terms, in arm's-length ventures.

We hold that the trial court did not err in concluding that no special relationship giving rise to a fiduciary duty existed between Lange and LeBlanc.

We overrule LeBlanc's second issue.

## Fairness of the Settlement Agreement

 In his third issue, LeBlanc contends that the trial court erred in ruling as a matter of law that the Settlement Agreement was fair. LeBlanc argues that, as Lange owed him a fiduciary duty, the Settlement Agreement is presumed unfair and that it is Lange's burden to prove its fairness. As we have held, however, that Lange did not owe a fiduciary duty to LeBlanc, either as his attorney or pursuant to a "special relationship," this point is moot.[3]

We overrule LeBlanc's third issue.

## Breach of Fiduciary Relationship

In his fourth issue, LeBlanc contends that the trial court erred in rendering summary judgment because there is a fact issue concerning whether Lange breached his fiduciary duty to him. As we have held, however, that Lange owed no formal or informal fiduciary duty to LeBlanc, this point is moot.

We overrule LeBlanc's fourth issue.

## Remainder of LeBlanc's Claims Against Lange

Lastly, in his fifth issue, LeBlanc complains that the trial court erred in rendering summary judgment on his remaining claims. We disagree.

### A. Fraud and Misrepresentation

Lange moved for, and the trial court rendered, summary judgment on LeBlanc's fraud and misrepresentation causes of action on the basis that there is no evidence that Lange made any material misrepresentations or that LeBlanc relied to his detriment on any such misrepresentations. LeBlanc claims that this was error. LeBlanc also argues that, because Lange owed him a fiduciary duty, Lange had a duty to disclose material information to him.

 A fiduciary's concealment of material information can be the basis for fraud. *Spoljaric v. Percival Tours, Inc.,* 708 S.W.2d 432, 435 (Tex.1986). As we have already held that Lange did not owe LeBlanc a fiduciary duty, however, it follows that Lange did not owe LeBlanc a duty of disclosure.

 Nor has LeBlanc raised a fact issue regarding a material misrepresentation by Lange to him. A defendant who moves for traditional summary judgment must conclusively disprove at least one element of the plaintiff's cause of action. *Little v. Tex. Dep't of Criminal Justice,* 148 S.W.3d 374, 381 (Tex.2004). The elements of fraud are as follows: (1) that a material misrepresentation was made; (2)

**3.** In his appellate brief, LeBlanc includes a one-line claim that the summary judgment evidence demonstrates that at the time the Settlement Agreement was created "Lange owed LeBlanc a fiduciary duty as ... his business partner...." LeBlanc provides no argument or citation to legal authority for this proposition. To assert an issue on appeal, an appellant's "brief must contain a clear and concise argument for the contention made, with appropriate citations to authorities...." Tex.R.App. P. 38.1(f). An appellant waives an issue on appeal if he fails to adequately brief that issue by presenting supporting arguments and authorities. *See id.; Brown v. Hearthwood II Owners Ass'n, Inc.,* 201 S.W.3d 153, 161 (Tex.App.-Houston [14th Dist.] 2006, pet. denied). Accordingly, this point is waived.

the representation was false; (3) the speaker knew it was false when made or made it recklessly without any knowledge of the truth and as a positive assertion; (4) the speaker made the representation with the intent that the other party should act upon it; (5) the party acted in reliance on the representation; and (6) the party thereby suffered injury. *Aquaplex, Inc. v. Rancho La Valencia, Inc.*, 297 S.W.3d 768, 774 (Tex.2009).

LeBlanc claims that Lange made a material misrepresentation with respect to the purpose for changing the Hospital's general partner. He claims that, had he known that he was being replaced as president and sole decision-maker for the Hospital, he would not have allowed it to happen. His contention is that, but for the misrepresentation, he, and not Lange, would have been in the position to sign the leasing agreement, and, thus, he would not have had to sign the Settlement Agreement in order to proceed with the sale of LifeCare.

■ The evidence shows that Lange did represent to LeBlanc that LeBlanc could not sign the lease extension on behalf of the Hospital because he had an interest in the transaction that disabled him, as an interested principal of the business entity, from unilaterally entering into such an agreement on behalf of the company as a matter of statutory law. LeBlanc has produced no evidence that this statement, on which he bases his fraud claim, was false, and the law is to the contrary. *See* TEX. REV. CRV. STAT. ANN. art. 1528n, § 2.17 (Vernon Supp.1997) (now-expired version of Texas Limited Liability Company Act applicable to transaction in question) (current version at TEX. BUS. ORGS. CODE ANN. § 101.255 (Vernon Supp.2009)). Thus, Lange has conclusively disproven an essential element of both negligent misrepresentation and fraud.

**B. DTPA Violations**

Lange moved for summary judgment on LeBlanc's claims under the DTPA, claiming that there was no evidence that LeBlanc was a "consumer" as defined by the Act. The trial court granted this motion.

■ The DTPA defines a "consumer" as "an individual, partnership, corporation, this state, or a subdivision or agency of this state who seeks or acquires by purchase or lease, any goods or services, except that the term does not include a business consumer that has assets of $25 million or more...." TEX. BUS. & COM.CODE ANN. § 17.45(4) (Vernon 2011). Whether a person is a "consumer" for DTPA purposes is a question of law. *Roberts v. Healey*, 991 S.W.2d 873, 881 (Tex.App.-Houston [14th Dist.] 1999, pet. denied).

LeBlanc's claim that he was a consumer is premised upon his claim that Lange was his attorney and, therefore, he was a consumer of LeBlanc's legal services. We have held, however, that no attorney-client relationship existed between LeBlanc and Lange at any pertinent time. LeBlanc has produced no other evidence that Lange offered any goods or services for sale or lease to LeBlanc or that LeBlanc purchased or leased any goods or services from Lange. Accordingly, the trial court correctly rendered summary judgment as to LeBlanc's DTPA claims, and it is unnecessary to address LeBlanc's issues concerning his financial wherewithal.

**C. Illegality of Settlement Agreement [4]**

■ LeBlanc claims that the Settlement Agreement is illegal because it violates Penal Code section 32.43(b). This section provides that "a person who is a

---

4. LeBlanc pled illegality, not as a claim against Lange, but solely as a defense against the enforcement of the Settlement Agreement.

This defense was the subject of a separate summary judgment motion by Ethicus, which the trial court granted.

fiduciary commits an offense if, without the consent of his beneficiary, he intentionally or knowingly solicits, accepts, or agrees to accept any benefit from another person on agreement or understanding that the benefit will influence the conduct of the fiduciary in relation to the affairs of his beneficiary." TEX. PENAL CODE ANN. § 32.43(b) (Vernon 2011).

 This commercial bribery statute does not apply in this case. Penal Code violations do not give rise to private causes of action. *A.H. Belo Corp. v. Corcoran,* 52 S.W.3d 375, 379 (Tex.App.-Houston [1st Dist.] 2001, pet. denied). Furthermore, to the extent he is attempting to argue some common-law version of contract illegality, LeBlanc has not proven that the Settlement Agreement was an illegal contract. As we have held that there is no fiduciary relationship between LeBlanc and Lange, the only fiduciary relationship in question here would be between Lange as manager of SGP, the general partner of the Hospital, and Ethicus. There is no evidence that Lange agreed to accept any benefit from any party without the consent of SGP and Ethicus. Indeed, there is no evidence that Lange agreed to accept any benefit from any party without the consent of LeBlanc, as LeBlanc signed the Settlement Agreement.

As a matter of law, the statute does not apply and the trial court correctly rendered summary judgment as to the alleged illegality of the Settlement Agreement.

## D. Duress

 LeBlanc also complains of the trial court's rendition of summary judgment on his affirmative defense of duress. The elements of duress are: (1) a threat or action taken without legal justification; (2) the action or threat was of such a character as to destroy the other party's free agency; (3) the threat or action overcame the opposing party's free will and caused it to do that which it would not otherwise

have done and that which it was not legally bound to do; (4) the restraint was imminent; and (5) the opposing party had no present means of protection. *Chapman Children's Trust v. Porter & Hedges, L.L.P.,* 32 S.W.3d 429, 443 (Tex.App.-Houston [14th Dist.] 2000, pet. denied).

LeBlanc attempts to meet the first element of his affirmative defense of duress by arguing that Lange did not have the legal right, i.e., justification, to refuse to extend the lease for several reasons. He claims that Lange did not have the legal right because he had fraudulently placed himself in a position of authority with the general partner of the Hospital. Because we have found that LeBlanc, as an interested party, was precluded as a matter of law from exercising such authority personally in any case, this argument fails. Next, LeBlanc claims that the refusal to extend the lease violated Lange's fiduciary duty to him. Again, we have held that no such duty exists. This argument also fails.

Finally, LeBlanc argues that refusing to extend the lease was against the best interest of the Hospital, to which Lange owed a fiduciary duty as its lawyer and officer. Even if a fact issue could be raised as to whether refusing to extend the lease was against the best interest of the Hospital, such an issue has no bearing on whether Lange, as the principal of the general partner of the Hospital and as the only disinterested manager, had a legal right or justification to extend or refuse to extend the lease. As the only disinterested manager of the general partner of the Hospital, Lange was the only person who did have the legal right or justification to make decisions for the Hospital. Thus, LeBlanc failed to conclusively establish the first element of his duress claim.

## E. Unconscionability of Settlement Agreement

Lastly, LeBlanc complains of the trial court's rendition of summary judgment on

his action to declare the Settlement Agreement void as "unconscionable."

 The unconscionability of a contract is a question of law for the court. *Ski River Dev., Inc. v. McCalla,* 167 S.W.3d 121, 136 (Tex.App.-Waco 2005, pet. denied). In Texas, the party asserting unconscionability has the burden of proving both procedural and substantive unconscionability. *Id.*

 To determine procedural unconscionability, courts examine "the contract formation process and the alleged lack of meaningful choice." *BDO Seidman, LLP v. J.A. Green Dev. Corp.,* 327 S.W.3d 852, 858–59 (Tex.App.-Dallas 2010, no pet.). Substantive unconscionability, on the other hand, concerns the fairness in the contract provisions themselves. *See In re Halliburton Co.,* 80 S.W.3d 566, 571 (Tex.2002). The grounds for substantive unconscionability must be "sufficiently shocking or gross to compel the court to intercede, ... and the same is true for procedural abuse-the circumstances surrounding the negotiations must be shocking." *McCalla,* 167 S.W.3d at 136.

 A review of the facts herein reveals nothing "shocking" or "gross" either procedurally or substantively. LeBlanc stood to make $50 million from the sale of his LifeCare stock. The buyers, however, asked LeBlanc to sign a non-competition agreement with terms that impinged upon the interests of LeBlanc's and Lange's mutual business entities. Lange asked to see the agreement to determine its effect on the Hospital and Ethicus, whose interests he represented. From the earliest time at which LeBlanc presented Lange with the non-competition agreement, Lange made clear his objections to it on behalf of the business entities, not only in communications with LeBlanc but in communications with LeBlanc's attorneys at FCJ. The idea of the Settlement Agreement arose in a meeting between Lange, Chris LeBlanc, acting as LeBlanc's emissary, and Styles on July 8, 2005 and was worked out in these arm's-length negotiations over a several-week period. The $3 million compensation figure was offered by Styles as compensation for freeing LeBlanc's stock in LifeCare from its pledge to Ethicus's investors. The figure was based on Chris LeBlanc's estimate that Ethicus's lost profit for its first full year as licensed LTAC facility in the Hospital would be about $4 million.

LeBlanc was a sophisticated businessman, represented by counsel—FCJ in Houston and Blue Williams in New Orleans—who was being offered $50 million to buy his stock. Through his attorneys, he could have asked Carlyle for revision of the offending terms of the non-competition agreement. LeBlanc might have felt that he "had no choice" but to sign the agreement if he wanted to sell his LifeCare stock, as he testified, and that he had no bargaining ability, but there are no "shocking" facts suggesting procedural unconscionability in this business adjustment among sophisticated businessmen.

Likewise, nothing in the Settlement Agreement itself suggests substantive unconscionability. The Settlement Agreement represented a business solution to a complex problem. It released LeBlanc's LifeCare stock from LeBlanc's pledge to the Ethicus investors, it compensated Ethicus for the loss of profits due to the lease extension for LifeCare, and it enabled LeBlanc to sell his LifeCare stock for more than $50 million. These terms cannot be considered "shocking" or "gross" from LeBlanc's perspective.

Finally, a provision in the Settlement Agreement whereby Lange had the option to buy LeBlanc's interest in the Hospital for $3.8 million was in no sense "shocking." Such a provision would make it possible to free the Hospital from the disabilities im-

posed by LeBlanc's non-competition agreement and to provide substantial compensation to LeBlanc. We conclude that there are no grounds for a finding of substantive unconscionability. *See McCalla*, 167 S.W.3d at 136.

We hold that the trial court did not err in ruling against LeBlanc as a matter of law on his claims of fraud, misrepresentation, DTPA violations, illegality, duress, and unconscionability.

We overrule LeBlanc's fifth issue.

### Conclusion

We affirm the judgment of the trial court.

Justice SHARP, concurring in the judgment only.